**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**S.R. and T.R.**, as Parents and Legal Guardians of **JANE DOE**, a Minor,

Plaintiffs,

v.

**TAWAS AREA SCHOOLS**, **TAWAS AREA SCHOOLS BOARD OF EDUCATION**, and individuals **JOHN KLINGER**, **AMANDA LIZOTTE**, **SARAH DANEK,** and **JANICE TIFFANY**, in their official and individual capacities,

Defendants.

Case No.

Hon.

**COMPLAINT / JURY DEMAND**

Jacquelyn Kmetz (P83575)
Elizabeth Abdnour (P78203)
Ashley Dylenski (P88208)
ABDNOUR WEIKER, LLP
325 E. Grand River Ave., Suite 250
East Lansing, MI 48823
(517) 994-1776
jacquelyn@education-rights.com
liz@education-rights.com
ashley@education-rights.com

*Attorneys for Plaintiffs*

## COMPLAINT AND JURY DEMAND

Plaintiffs S.R. and T.R., as parents and legal guardians of JANE DOE,[1] by and through their attorneys, ABDNOUR WEIKER LLP, hereby file the following complaint against Defendants as captioned above.

## JURISDICTION AND VENUE

1. This action is brought pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq*.; Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, *et seq*.; Title IX of the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681, *et seq*.; and Michigan's Persons with Disabilities Civil Rights Act (PDCRA), M.C.L. 37.1101, *et seq*.

2. This is also an action to redress the deprivation of Plaintiffs' constitutional rights under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983.

3. This Court has original jurisdiction over Plaintiffs' federal claims based on 29 U.S.C. § 626 and 28 U.S.C. § 1331, which grants district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

4. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action

[1] Jane Doe is a pseudonym.

authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6. Plaintiff's claims are cognizable under the U.S. Constitution and under the ADA, 42 U.S.C. § 12131, *et seq*.; Section 504, 29 U.S.C. § 794, *et seq*.; and Title IX, 42 U.S.C. § 1681, *et seq*.

7. The events giving rise to this lawsuit occurred in Tawas, Michigan, which sits in the Eastern District of Michigan.

8. Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

## PARTIES

9. Plaintiffs S.R. and T.R. were at all relevant times and continue to be residents of Tawas, Michigan, and the parents and legal guardians of Jane Doe.

10. Jane Doe is a fifeen-year-old minor child, a resident of Tawas, Michigan, and at all relevant times was a student in Tawas Area Schools.

11. Defendant Tawas Area Schools ("TAS" or "the District") was at all relevant times and continues to be a public educational institution in Tawas, Michigan, organized and existing under the laws of the State of Michigan. The District is a recipient of federal financial assistance, subject to the requirements of Section 504; 34 C.F.R. § 104.31, *et seq.*; and Title IX; and a public governmental entity subject to the provisions of the ADA, 42 U.S.C. § 12131, *et seq*. The District is a place of public accommodation subject to the provisions of PDCRA, M.C.L. 37.1101, *et seq.*

12. Defendant TAS Board of Education is the governing body for TAS.

13. Defendant TAS and Defendant TAS Board of Education are hereinafter collectively referred to as "the TAS Defendants."

14. At all material times, Defendant John Klinger, in his official capacity, worked within Tawas County, State of Michigan, and was an agent and/or employee of TAS, acting or failing to act within the scope, course, and authority of his employment and employer, and served as the Superintendent of TAS.

15. At all material times, Defendant Amanda Lizotte, in her official capacity, worked within Tawas County, State of Michigan, and was an agent and/or employee of TAS, acting or failing to act within the scope, course, and authority of

her employment and employer, and served as Title IX, Section 504, and Title II Coordinator for TAS, as well as the school social worker for Tawas Middle School.

16. At all material times, Defendant Sarah Danek, in her official capacity, worked within Tawas County, State of Michigan, and was an agent and/or employee of MCS, acting or failing to act within the scope, course, and authority of her employment and employer, and served as the Principal of Tawas Middle School.

17. At all material times, Defendant Janice Tiffany, in her official capacity, worked within Tawas County, State of Michigan, and was an agent and/or employee of MCS, acting or failing to act within the scope, course, and authority of her employment and employer, and served as the Assistant Principal of Tawas Middle School.

## **APPLICABLE LAW AND POLICIES**

18. The ADA and Section 504 mandate non-discriminatory access to federally funded programs. *See Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 170 (2017).

19. Public schools that receive federal funds must comply with both statutes, and the same underlying conduct can violate the ADA and Section 504 simultaneously. *Id.* at 171.

20. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

21. Further, under Title II of the ADA, covered entities must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability . . . ." 28 C.F.R. § 35.130(b)(7).

22. Similarly, Section 504 and its implementing regulations provide that no one may be excluded from a program or activity receiving federal funds "solely by reason" of her disability. 29 U.S.C. § 794(a); *see also* 34 C.F.R. § 104.4(a).

23. PDCRA also guarantees full and equal use of public accommodations, public services, and educational facilities free from discrimination because of a disability. M.C.L. 37.1102.

24. PDCRA prohibits educational institutions and public services from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability. . ." M.C.L. 37.1402(a).

25. Title IX, 20 U.S.C. § 1681(a), provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

26. Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106.

27. 34 C.F.R. § 106.8(c) provides:

> A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part and a grievance process that complies with §106.45 for formal complaints as defined in §106.30.

28. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-on-student discrimination.

29. In *Davis v. Monroe County Board of Education*, 526 U.S. 629, 633 (1999), the Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student, rather than a teacher.

30. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school. 526 U.S. at 650.

31. In assessing deliberate indifference, 34 C.F.R. § 106.30(a) differentiates between the responsibilities of employees in elementary and secondary schools. In higher education institutions, actual knowledge of a hostile environment can only be imputed to a "Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient" who has received notice of allegations of sex discrimination. However, in elementary and secondary schools, actual knowledge can be imputed to "any employee of an elementary and secondary school" provided with notice of allegations of sex discrimination.

32. In *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613, 618 (6th Cir. 2019), the Court of Appeals for the Sixth Circuit held that, in order to be liable for deliberate indifference under Title IX, a school's response must have failed to protect a plaintiff against actual further harassment: "…a student-victim plaintiff must plead, and ultimately prove, that the school had actual knowledge of actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable sexual harassment against the student-victim, which caused the Title IX injuries."

33. In *Doe v. Metropolitan Government & Davidson County*, the Court of Appeals for the Sixth Circuit adopted the Ninth Circuit test for Title IX pre-assault claims, which provides: "A student must show: 1) the school maintained a policy of

deliberate indifference to reports of sexual misconduct, 2) which created a heightened risk of sexual harassment that was known or obvious, 3) in a context subject to the school's control and 4) as a result the plaintiff suffered harassment that was 'so severe, pervasive and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school.'" 35 F.4th 459, 465 (6th Cir. 2022) (citing *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020)). In essence, a school's deliberate indifference to known past acts of sexual misconduct must have caused the misconduct that the student currently alleges to proceed with a pre-assault claim. The court further held that, when alleging post-assault claims, K-12 students need not prove that further harassment must be inflicted against the same victim. Instead, the *Doe* court held that the "same victim" requirement from *Kollaritsch*–which involved a university–did not apply in the K-12 context because K-12 schools have more authority and control over students than at the university level. *Id*. at 468.

34. To prevail on a civil rights claim pursuant to 42 U.S.C. § 1983, a plaintiff must demonstrate (1) "a person acting under color of state law"; (2) "deprived [her] of a right secured by the Constitution or laws of the United States." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006).

35. The First Amendment to the United States Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend.

I.

36. In *Tinker v. Des Moines Independent Commmunity School District*, 393 U.S. 503, 506 (1969), the Supreme Court held that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

37. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law" nor shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

38. Under both Title IX and Section 504, "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by . . . this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7(e); 34 C.F.R. § 106.71 (Title IX) (incorporating 34 C.F.R. §100.7(e) by reference); 34 C.F.R. § 104.61 (Section 504) (incorporating 34 C.F.R. §100.7(e) by reference).

39. Title II contains similar language prohibiting retaliation, stating:

> (a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.
>
> (b) No private or public entity shall coerce, intimidate,

> threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.

28 C.F.R. § 35.134.

40. PDCRA has nearly identical language prohibiting retaliation, stating, "A person or 2 or more persons shall not do the following: (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. 37.1602(a).

## FACTUAL ALLEGATIONS

41. During the 2023-2024 school year, Jane Doe was a seventh-grade student at Tawas Middle School (TMS), a school educating students in fifth through eighth grades in TAS.

42. In 2018, during second grade, Jane Doe was repeatedly threatened and abused by a peer and, although Plaintiffs repeatedly advised the District of their concerns and the socio-emotional impact on Jane Doe, the District never addressed the attacks.

43. Ultimately, the peer pushed Jane Doe from behind while running, smashing her face into the pavement while on recess and resulting in injuries to Jane

Doe requiring surgery and significant therapy.

44. Following this incident, Plaintiffs withdrew Jane Doe from the District and enrolled her in a local private school, Holy Cross Family School ("Holy Cross").

45. While at Holy Cross, Jane Doe struggled with anxiety and depression, as well as reading deficits attributed to dyslexia.

46. Jane Doe was enrolled in counseling and received additional reading supports from Holy Cross.

47. Unfortunately, Holy Cross only educated students through sixth grade, and, without local alternative school options, Jane Doe was forced to re-enroll in TAS for seventh grade, the 2023-2024 school year.

48. This only served to exacerbate Jane Doe's anxiety and depression, and she continued to struggle significantly with peer relationships.

49.Upon enrolling in TAS, students are provided with a student handbook containing policies to be followed by both students and employees, constituting an implied contract.

50.TAS provided Plaintiffs with a copy of the TAS Student Handbook in 2023 when Jane Doe enrolled.

51.The Student Handbook required TAS to investigate any allegations within the scope of Title IX and to provide interim measures to support the student experiencing sexual harassment.

52. John Roe and John Poe[2] were sixth grade students at Tawas Middle School during the 2023-2024 school year.

53. John Roe and John Poe began bullying and harassing Jane Doe in approximately June 2023.

***John Roe and John Poe's Sexual Harassment of Jane Doe***

54. In June 2023, John Roe began harassing Jane Doe via SnapChat videos, sending her repeated unwelcome requests to share nude photos of herself with him.

55. Jane Doe refused to send the nude photos.

56. John Roe initially attempted to coerce Jane into sending the nude photos via platitudes about how he liked her.

57. When Jane Doe continued to refuse, John Roe threatened to send a nude photo of another girl who looked like Jane Doe to Jane's father, so that Jane's father would think she had shared nude photos of herself.

58. At this time, Jane Doe was 12 years old.

59. Because Jane Doe was terrified that John Roe would send a nude photograph that looked like her to her father, on June 22, 2023 she relented and sent a nude photograph of herself to John Roe via SnapChat.

60. This made Jane Doe feel worthless and disgusted with herself.

61. Upon information and belief, John Roe shared the image with his two

[2] John Roe and John Poe are pseudonyms.

brothers, John Poe and John Foe[3], as well as two friends Jim Bake and Jim Cake.[4]

62. The following day, John Roe told Jane Doe's aunt that he had nude photos of Jane Doe.

63. John Roe then sent Jane Doe's aunt two nude photos of Jane Doe.

64. Jane Doe's aunt immediately notified Jane's mother, Plaintiff T.R., of the situation.

65. Plaintiff T.R. confronted Jane Doe about the photos.

66. During this conversation, Jane Doe explained the conversation and John Roe's threat to share nude photos of a girl who looked like Jane Doe with Jane Doe's father.

67. Shortly after this conversation, Plaintiffs became aware that Jane Doe's nude photos had been shared with other students without her knowledge or consent, as Jane Doe received multiple frightening messages from peers about the pictures and Plaintiffs also heard about the photos from other members of their community.

68. At the time, Plaintiffs did not immediately report the situation to law enforcement as they had already spoken to Jane Doe about the situation, Jane Doe was already participating in counseling, and Plaintiffs hoped the situation would resolve itself by the start of the school year.

---

[3] John Foe is a pseudonym.

[4] Jim Bake and Jim Cake are pseudonyms.

69. In addition, they were worried that involving law enforcement would cause Jane Doe further trauma.

70. In late July 2023, before the start of the school year, John Roe resumed his sexual harassment of Jane Doe, requesting and threatening her for more nude photos.

71. On or about July 24, 2023, John Roe began sending Jane Doe unwelcome text messages saying he wanted to have sex with her in the bathroom at the local pier.

72. Jane Doe was on her way to counseling with her mother, T.R., when she began receiving the messages, and she shared the content of the text messages with her mother as she was receiving them.

73. The text messages continued during Jane Doe's trip home from her counseling session, about an hour later.

74. John Roe repeatedly texted Jane Doe things such as, "I'll see you at 7 in the bathroom," "I wanna see you naked," "Yk[5] you want too," "Ya you are yk you want me inside you slut," and "Nvm[6] you want a cream pie.[7]"

75. Jane Doe repeatedly texted John Roe "no" and asked him to stop

[5] You know.
[6] Never mind.
[7] "A creampie (also known as internal ejaculation, and often in same-sex contexts as breeding) is…a sexual act featured in hardcore pornography in which a man ejaculates inside his partner's vagina (or anus) without the use of a condom, resulting in visible seeping or dripping of semen from the orifice." *Creampie (sexual act)*, WIKIPEDIA, https://en.wikipedia.org/wiki/Creampie_(sexual_act) (last visited Aug. 28, 2026).

messaging her and asking her for nude photos and sex.

76. John Roe also made additional threats against Jane Doe, including saying he would share Jane Doe's photo again, or other photos he would claim were Jane Doe's, and he would "tell everyone we fucked and I cum in you," if she did not agree to his requests.

77. Jane Doe continued to tell John Roe "no" and asked him to stop messaging her and asking her for nude photos and sex.

78. This made Jane Doe feel angry and scared that he was threatening her again.

79. This also made Jane Doe feel unsafe.

80. When Jane Doe and T.R. arrived home, they told Jane Doe's father, Plaintiff S.R.

81. S.R. then called the police to report the messages.

82. The assigned officer, Jeremy Daniszewski, was also the Tawas Middle School Resource Officer.

83. Officer Daniszewski advised Plaintiffs he would do what he could to try to stop the ongoing harassment, but at that time the pictures had already been shared numerous times, so he did not know that he would be able to prevent them spreading further.

84. Upon information and belief, Officer Daniszewski attempted to obtain

John Roe's phone, but his parents refused to consent.

85. Upon information and belief, John Roe denied the conduct and blamed it on another student.

86. However, upon information and belief, the other student's parents consented to a law enforcement search of their son's phone and no incriminating messages or photos were found.

87. Officer Daniszewski advised Plaintiffs he would inform the Tawas Middle School principal, Defendant Sarah Danek, and other appropriate school staff of the harassment, so they could monitor the situation when school started in the fall.

88. Officer Daniszewski later confirmed with Plaintiffs he had informed Defendant Danek of the situation.

89. Prior to the start of the school year, approximately mid-August at the time of school orientation, Plaintiff T.R. also notified the Tawas Middle School secretary at the time, Denise[8], of John Roe's ongoing harassment and stalking of Jane Doe.

90. T.R. spoke with Denise to ask that Jane Doe be scheduled into classes with one of her friends from Holy Cross due to John Roe's ongoing harassment and stalking.

91. T.R. explained being scheduled with a friend would make Jane Doe feel

[8] Last name is unknown to Plaintiffs.

like she wasn't alone at the school.

92. T.R. specifically shared Jane Doe felt targeted and like she had no one who understood her.

93. Immediately upon the start of the 2023-2024 school year, in August 2023, students at Tawas Middle School began sharing or re-sharing Jane Doe's nude photos with other students without her consent during the school day.

94. On the second day of school, on or around August 29, 2023, on the bus ride to school, a high school student, Jill Foe,[9] started throwing pencils at Jane Doe.

95. When Jane Doe failed to respond, Jill Foe showed Jane Doe's nude photos to her friend next to her.

96. This resulted in a physical altercation between Jill Foe and Jane Doe.

97. Jane Doe started yelling at Jill Foe and Jill Foe's friend stood up in between the two of the girls.

98. Jane Doe tried to climb over the middle girl to contact Jill Foe but could not get past the friend standing between them.

99. Jane Doe was angry and felt singled out and like she could not do anything right.

100. The following day, Mr. Livingston, the high school principal, called T.R. to inform her of the situation.

---

[9] Jill Foe is a pseudonym.

101. TAS students continued relentlessly harassing Jane Doe about the nude photos throughout September and October 2023.

102. During the lunch period, if other students sat next to Jane Doe, John Poe, John Roe's brother, would walk up to them, show them Jane's nude picture, and make comments about "how disgusting" Jane Doe is.

103. This happened almost every day, Monday to Friday, at school, while Jane Doe attended in person.

104. Ms. Tiffany and a lunchroom aide, whose name is unknown to Plaintiffs, were consistently present in the cafeteria and saw this happening but failed to stop the behavior.

105. This made Jane Doe feel alone and like no one was helping or would help her.

106. Upon information and belief, John Roe and John Poe also perpetrated this form of sexual harassment on other students at Tawas Middle School.

107. On one occasion in or around October 6, 2023, John Poe began showing Jane Doe's nude photos to other students in the hallway.

108. Another student, Betty Lou,[10] told Jane Doe what John Poe was doing.

109. Together, the girls went and told the assistant principal, Janice Tiffany, that John Poe had been sharing Jane Doe's nude pictures to other students in the

[10] Betty Lou is a pseudonym.

hallway without her consent.

110. Upon information and belief, Ms. Tiffany did nothing.

111. This made Jane Doe feel worthless, like she wasn't worth helping.

112. The following day, Plaintiffs went up to the school to address the incident with Ms. Tiffany.

113. Upon information and belief, after Plaintiffs spoke with Ms. Tiffany, she called the other student, Betty Lou, into her office, but for reasons not known to Plaintiffs, Betty Lou retracted her statements about seeing John Poe share Jane Doe's nude pictures.

114. However, Plaintiff S.R. later spoke with Betty Lou's father, a good friend of his, and Betty Lou's father advised John Roe and John Poe had also harassed Betty Lou the previous school year.

115. Upon information and belief, because of this former harassment, Betty Lou was terrified of further retaliation or harassment from John Roe or John Poe, which is why she retracted her statement upon the subsequent questioning by Ms. Tiffany.

116. Shortly after this incident, on or around October 4, 2023, Jane Doe was sitting at a lunch table in the TAS cafeteria with another student, Jake Lake[11], when a group of students approached them and began calling Jane Doe a "slut" and asking

[11] Jake Lake is a pseudonym

Jake Lake why he would sit with her.

117. This made Jane Doe feel even further isolated and alone.

118. Jane Doe feared whatever friends she did have were going to stop being her friend because they were going to start being harassed for being affiliated with her.

119. On October 5, 2023, TAS implemented no contact orders between Jane Doe and John Roe, and between Jane Doe and John Poe.

120. Upon information and belief, these were signed by Jane Doe and Plaintiff S.R., but not by the District, although Janice Tiffany facilitated the orders.

121. Although Jane Doe was the victim of abuse, and had done nothing wrong, the no contact orders placed prohibitions on her regarding communication and put Jane Doe at risk of disciplinary action if the no contact orders were violated.

122. Even after the no contact orders were implemented, students continued to circulate Jane Doe's nude photos, and they continued to harass and abuse her, telling her, "You're a slut," and "Go kill yourself."

123. As a result of the constant abuse and harassment, Plaintiffs had to pick Jane Doe up from school every day rather than allowing her to ride the bus.

124. As a result of Jane Doe being unable to safely ride the bus, there were times when Plaintiff T.R. was unavailable to pick up Jane Doe and Plaintiff S.R or other family members had to leave work early to pick up Jane Doe.

125. Upon information and belief, TAS staff knew the harassment continued, as it occurred repeatedly on school property, including in the lunchroom and throughout the school building, and Jane Doe and Plaintiffs repeatedly told TAS staff about it in-person conversations, phone calls, emails, and text messages.

126. Incredibly, TAS continued to deny any knowledge of the abuse to Plaintiffs, claiming it could not be observed on school cameras.

127. On or around September 18, 2023, Defendant Janice Tiffany emailed Defendant Danek, acknowledging that Jane Doe continued to have "issues" with other students and that the school social worker, Amanda Lizotte, was concerned about Jane Doe's sleeping and eating habits.

128. Defendant Tiffany also noted Plaintiff T.R.'s concern that Jane Doe had been previously hospitalized for suicidal ideation due to the harassment from John Roe, John Poe, and other students back in May 2023, approximately a month before John Roe began harassing her for nude pictures.

129. On or around September 28, 2023, Defendant Lizotte emailed Jane Doe's individualized education plan (IEP) team, which included Defendant Tiffany and the TAS special education director, Nicol Timo, noting that Jane Doe had been struggling with ongoing rumors about her nude photos and that students continued to harass her.

130. On or around October 11, 2023, Jane Doe's cheerleading coach,

Melissa Kendall, emailed the TAS athletic director, Jonathan Mejeur, regarding the bullying and harassment against Jane Doe.

131. Ms. Kendall noted that TMS administrators and staff knew about the ongoing stalking, sexual exploitation, and harassment of Jane Doe by other students.

132. Ms. Kendall also noted that since the no contact orders had been implemented, John Roe and John Poe had recruited other students to act on their behalf and harass and stalk Jane Doe.

133. Ms. Kendall wrote that she had "been made aware of prior situations involving other cheerleaders that have occurred very similar to [Jane Doe]'s."

134. Mr. Mejeur forwarded Ms. Kendall's email to Defendants Tiffany and Danek within minutes of receiving the email.

135. TAS did not provide Plaintiffs or Jane Doe with any information about TAS's Title IX Policy, reporting procedures, supportive measures, the identity of its Title IX Coordinator, or of their right to report the harassment and abuse to the U.S. Department of Education, the U.S. Department of Justice, or the Michigan Department of Civil Rights.

136. TAS did not initiate an investigation into the report.

137. Upon information and belief, other than issuing the no contact orders, TAS took no action.

***Disability Discrimination During the 2023-2024 School Year***

138. From the time Jane Doe started at TAS, she struggled with symptoms of anxiety and depression, as well as independently completing her academic assignments.

139. In addition to ongoing and increasing socio-emotional needs at school that were directly impacting her ability to access her education equal to her nondisabled peers, Jane Doe also continued to struggle academically due to her dyslexia.

140. Jane Doe was placed in a Title I reading support class to address her reading difficulties.

141. On or about September 18, 2023, Defendant Lizotte expressed concern about Jane Doe's eating and sleeping habits to Defendant Tiffany.

142. Also on or about September 18, 2023, Plaintiff T.R. shared with Defendant Tiffany that Jane Doe had spent time in inpatient hospitalization due to suicidal ideation and was currently on medication to address the mental health needs.

143. Defendant Tiffany shared this information with Defendant Danek on or about September 18, 2023.

144. Throughout September 2023, Jane Doe was spending an increasing amount of time in Defendant Lizotte's office due to feelings of increased worry and anxiety interfering with her ability to focus in class.

145. As of September 28, 2023, Jane Doe was meeting with Defendant Lizotte weekly.

146. In her meetings with Defendant Lizotte, Jane Doe expressed feeling overwhelmed, stress, and a lot of anxiety.

147. Jane Doe also expressed to Defendant Lizotte feeling overwhelmed because she could not get her schoolwork done and did not have enough time to complete work.

148. Jane Doe also reported to Defendant Lizotte that she felt overwhelmed and unable to self-regulate due to the noise volume in her classes.

149. In an email to Jane Doe's IEP team on September 28, 2023, Defendant Lizotte noted Jane Doe was spending a lot of time out of class, either in the office, hallway, or social work office.

150. In the mornings, Jane Doe would wake up begging not to go to school, try to come up with excuses, or make herself sick so she could stay home.

151. When these efforts failed to work, Jane Doe would often go to school and make herself sick so Plaintiffs had to pick her up, or Jane Doe would call Plaintiffs panicking to please be picked up.

152. Jane Doe was diagnosed with major depressive disorder and had been since May 23, 2022.

153. TAS was aware of this diagnosis.

154. Despite knowledge of Jane Doe's struggles and diagnosis, TAS continued to place her in general education classes with no supports or services.

155. On or around September 28, 2023, Jane Doe was referred for a special education evaluation only after Plaintiffs submitted a request in writing, pursuant to the Individuals with Disabilities in Education Act (IDEA).

October 2023 Disciplinary Incident and Investigation

156. On or around October 17, 2023, shortly before the special education evaluation was completed, TAS falsely accused Jane Doe of writing a bomb threat on the bathroom wall.

157. On or around October 17, 2023, Plaintiffs received notice that Jane Doe was being suspended for allegedly admitting to a threat and, due to the TAS's "zero tolerance" policy, she was going to be recommended for expulsion from school at a hearing before the TAS Board on Monday, October 30, 2023.

158. Although the letter superficially claimed that TAS had considered all seven (7) factors required by M.C.L. 380.1310d prior to the suspension or expulsion of a student, no documentation or proof was ever provided to Plaintiffs to support this claim.

159. The only evidence TAS had to support its false claim against Jane Doe was that she was seen on video walking into the bathroom with a pencil shortly before the threat was reported.

160. The threat was discovered on the evening of Friday, October 13, 2023, yet TAS only questioned girls who had visited the bathroom between 12:00 and 1:30pm on that date.

161. Upon information and belief, TAS failed to pull the video footage from before 12:00 p.m. or after 1:30 p.m. to identify any other students who had entered the same bathroom and could have written the threat.

162. Further, the threat on the stall appeared to have been written in ink, and by TAS's own admission, Jane Doe was carrying a pencil.

163. TAS also admitted to only obtaining writing samples from "some" of the students seen going into the bathroom between 12:00 and 1:30 p.m. on October 13, 2023, not all.

164. TAS also claimed Jane Doe had "admitted" to writing the threat when she was later questioned on Tuesday, October 17, 2023.

165. The alleged "admission" took place after Jane Doe had been locked in an office room for two and a half hours with Defendants Sarah Danek and Janice Tiffany, Doug Livingston, and a uniformed police officer.

166. During the interrogation, Jane Doe was told she was not allowed to call her parents until after she admitted, in writing, that she was responsible for the bomb threat, despite Jane Doe repeatedly telling defendants that she had not done it.

167. In her "confession," Jane Doe could not even spell "bomb" correctly,

due to her dyslexia.

168. Instead, she spelled it phonetically as "boom."

169. Yet, whoever wrote the threat on the bathroom stall did spell "bomb" correctly.

170. In fact, there were no spelling errors whatsoever in the statement on the bathroom stall.

171. As part of the disciplinary packet, TAS included various journal writings from Jane Doe, including statements such as, "The rumors don't ever stop when they need to . . . and it's getting worse," and "It's killing me that they won't stop."

October 30, 2023 Expulsion Hearing

172. Concerned about the discrepancy between the threat and Jane Doe's handwriting, as well as the intimidating way Jane Doe was interrogated, Plaintiffs retained a handwriting expert, Robert Baier, to analyze whether the threat could have been written by Jane.

173. Mr. Baier is a top forensic handwriting expert, who regularly appears as an expert witness in court and has trained law enforcement groups.[12]

174. After conducting a thorough review of the handwriting samples from

[12] For more information regarding Mr. Baier's credentials, please see https://expertdocumentexaminerweb.com/expert-handwriting-analyst-forensic-document-examiner/ (last visited Aug. 28, 2026).

the bomb threat, Mr. Baier concluded that Jane Doe could not possibly have written the statement on the bathroom wall due the numerous significant differences between Jane Doe's handwriting and the handwriting of the statement on the wall.

175. These differences included slope, location of pictures, patterns, letter forms, and beginning and ending strokes.

176. In reaching this conclusion, Mr. Baier compared more than 1,100 individual letter formations of Jane Doe's writing.

177. Plaintiffs presented Mr. Baier's report and findings, along with information regarding Jane Doe and her disabilities, at the TAS Board hearing on October 30, 2023.

178. At the Board hearing, TAS completely disregarded Mr. Baier's report; the lack of spelling errors in the written threat despite Jane Doe's severe dyslexia; Jane Doe's failure to independently and accurately identify the threat when first asked; Jane Doe's statements were all made while being interrogated by the police officer, principal, and vice principal, with no access or ability to call her parents; and, most damningly, that Jane Doe's "confession" came only after she was told that she would not be released from her interrogation until she "confessed."[13]

---

[13] Research has repeatedly shown that juveniles are especially vulnerable to providing false confessions, particularly younger juveniles. *See* Saul M. Kassin, Hayley M. D. Cleary, Gisli H. Gudjonsson, Richard A. Leo, Christian A. Meissner, Allison D. Redlich, and Kyle C. Scherr, *Police-Induced Confessions, 2.0: Risk Factors and Recommendations*, Law and Human Behavior, Vol. 49, No. 1, 2025, at 21-22, available at https://psycnet.apa.org/fulltext/2025-79126-001.pdf; Megan Crane, Laura Nir Nirider, Steven A. Drizin, *Juvenile False Confessions*, American Bar Association Insights on Law & Society 16.2, Winter 2016, at 12-14, available at https://www.prisonpolicy.org/scans/aba/Juvenile_confessions.pdf; I. Bruce Frumkin, *Expert Testimony in Juvenile*

179. Instead, the Board expelled Jane Doe from school based solely on the fact that, at *one point* during her interrogation, she admitted to writing the threat, even though she had clearly been threatened and coerced into doing so by four powerful adults, and it was clearly an involuntary confession.

180. Notably, on or about October 13, 2023, two weeks before the expulsion hearing, a threat assessment was conducted for Jane Doe.

181. The threat assessment team included John Klinger, superintendent; unnamed members of the administration team, Brandon C. (last name unknown); Tony H. (last name unknown), Deputy; Jeremy Daniszewski, School Resource Officer; Ryan Aper, State Trooper from the Michigan State Police; and two other unnamed officers from the Michigan State Police.

182. The threat assessment team ultimately concluded the threat Jane posed to be "low level," meaning it was vague or indirect, and there was no plan or means to carry out the threat.

183. The threat assessment team also concluded that Jane Doe's mental state at the time was one of hopelessness and despair, and that her actions were indicative of attention seeking behaviors and poor mental health.

---

*and Adult Alleged False-Confession Cases*, 50 Ct. Rev. 12, 13, 14-16 (2014) available at https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1488&context=ajacourtreview. In *J. D. B. v. North Carolina*, 564 U.S. 261, 269, 271-277 (2011), the Supreme Court explicitly recognized this research in holding that a child's age must be factored into a custody analysis when determining the admissibility of a confession, noting that juveniles are particularly vulnerable to providing unreliable, false confessions, due to their lack of maturity, susceptibility to outside pressures, and inability to consider long-term consequences.

184. Upon information and belief, TAS did not consider this threat assessment at the expulsion hearing.

October 31, 2023 Manifestation Determination Review (MDR)

185. The MDR was finally held the day after the expulsion hearing, on October 31, 2023, but before Jane's special education evaluation was completed.

186. TAS found the alleged bomb threat not to be a manifestation of Jane Doe's disabilities.

187. In making this finding, TAS primarily looked at Jane Doe's dyslexia diagnosis, and ignored her depression and anxiety.

188. Although TAS briefly acknowledged Jane Doe's depression, it cited a letter from her family physician, dated August 2023, stating Jane Doe was "stable."

189. However, as previously noted and as shared by Plaintiffs during the MDR meeting, Jane Doe's mental health had been increasingly deteriorating since she started school in the fall and began suffering extreme harassment and abuse, which was *after* the letter had been written.

190. TAS completely ignored Jane Doe's anxiety diagnosis, as well as additional information from Plaintiffs and the email from Jane Doe's cheer coach expressing concerns about Jane Doe's depression.

191. Although both Plaintiffs and one of Jane Doe's teachers requested that the MDR be adjourned to allow Jane Doe to be further evaluated by her therapist,

TAS refused this request.

192. TAS also refused to consider that Jane Doe's innocence, and that her behaviors and statements on October 17, 2023, while being interrogated in an enclosed space by multiple adults and being told that she was not allowed to call her parents until she "confessed," were direct manifestations of her disabilities.

193. TAS also failed to provide a copy of the threat assessment with the MDR attendees, nor was the information from the threat assessment considered when determining whether Jane Doe's conduct was a manifestation of her disabilities.

November 1, 2023 Multidisciplinary Evaluation Team (MET) Report

194. The day after the MDR, on November 1, 2023, Jane Doe's initial special education evaluation, or MET report, was completed.

195. The purpose of the initial evaluation, or MET report, is to comprehensively evaluate all areas of the student's needs, even if not typically related to their disability, to then determine if the student is eligible for special education services and, if so, what the student's specific educational needs are in order to develop an appropriate program and services.

196. Notably, although the MET report was so close to being completed and TAS knew Jane Doe was being considered for eligibility as a student with an emotional impairment, TAS insisted on completing *both* the expulsion hearing and

the MDR, without reviewing or considering any information from the MET report.

197. Information from the MET report was directly relevant to both the expulsion hearing and the MDR to demonstrate how and why Jane Doe's alleged behavior was a manifestation of her disabilities and, therefore, why she should not be subject to a change of placement based on the alleged conduct.

198. The MET report noted that Jane Doe had been experiencing significant mental health symptoms since the start of summer 2023, including suicidal ideation and a stay at a psychiatric residential center, due to her severe depression and anxiety.

199. The report noted that, since starting school, Jane Doe's depression and anxiety only worsened due to the constant abuse, harassment, and stalking to which she was subjected, which resulted in increasing academic and social struggles.

200. The report noted that Jane Doe's socio-emotional issues were further starting to manifest in physical symptoms, including headaches, stomach aches, and fatigue.

201. In the report, Jane's teachers reported that while she was generally quiet and well-behaved, she often appeared very upset, anxious, or sick, which rendered her unable to function in class.

202. None of Jane Doe's teachers reported any disciplinary or conduct concerns, nor did Jane Doe have any disciplinary record.

203. One of the assessments given to Jane Doe was the emotional disturbance decision tree (EDDT).

204. The EDDT is an assessment tool for identifying whether a student is eligible for special education services under the category of emotional impairment.

205. Based on the characteristics of emotional impairment,[14] the EDDT developed, and assesses a student's performance in, the following four rating scales: inability to build or maintain relationships, inappropriate behaviors or feelings, pervasive mood/depression, physical symptoms or fears.

206. The EDDT also assesses a student's potential for attention deficit hyperactivity disorder (ADHD), psychosis/schizophrenia, and social maladjustment.

207. On the EDDT, Jane Doe's teacher, Mrs. Stein, rated Jane Doe in the mild at-risk range for her inability to build or maintain relationships, overall emotional disturbance, ADHD, and educational impact.

208. Jane Doe ranked herself in the moderate range for inability to build or maintain relationships and ADHD, in the high clinical range for her overall emotional disturbance and physical symptoms or fears, and in the very high clinical range in the pervasive mood/depression.

209. Jane Doe's parents ranked her in the mild at-risk range for ADHD; in

[14] Michigan's "emotional impairment" eligibility category, MARSE R 340.1706, corresponds to the IDEA's "emotional disturbance" eligibility category, 34 C.F.R. § 300.8(c)(4).

the moderate clinical range for inappropriate behaviors or feelings; in the high clinical range for inability to build or maintain relationships and pervasive mood/depression; and in the very high clinical range for physical symptoms or fears and overall emotional impairment.

210. All raters found Jane Doe to be in the mild at-risk range for psychosis/schizophrenia.

211. Another of Jane Doe's teachers, Ms. Dittenbir, completed the Behavior Assessment System for Children – Third Edition, teacher rating scales, and placed Jane Doe in the clinical range for internalizing problems, anxiety, and somatization. Ms. Dittenbir placed Jane Doe in the at-risk range for depression, learning problems, and leadership.

212. On the screen for child anxiety related disorders, both Jane Doe and Plaintiff T.R. identified Jane Doe as having an anxiety disorder.

213. Academically, teachers also commented that Jane Doe regularly asked for help with spelling.

214. On the Wechsler Individual Achievement Test – Fourth Edition (WIAT-4), Jane Doe performed below average for essay composition, well below average for reading, and significantly below average for mathematics.

215. The WIAT-4 has a total of four subtests to assess written expression: spelling, alphabet writing fluency, sentence composition, and essay composition.

Yet only the essay composition subtest was given to Jane Doe to assess her written expression, despite her diagnosis of dyslexia, which directly relates to spelling and writing, and despite TAS utilizing the complete set of subtests for both reading and math.

216. Cognitively, Jane Doe scored well below average, in only the second percentile. Jane Doe's highest score was her processing speed, yet even that fell only in the eighteenth percentile.

217. Despite Jane Doe's low scores and multiple identified areas of concern, TAS failed to conduct additional evaluations. It did not conduct an occupational therapy evaluation to further assess her motor and processing skills. Nor did it conduct a speech and language evaluation to assess her pragmatic and social communication skills or potential receptive or expressive language deficits.

218. Despite the evaluation detailing the severity of Jane Doe's socio-emotional and cognitive deficits, which provided important information about her anxious and inconsistent behaviors in the principal's office while being interrogated by three adults (including a uniformed police officer), TAS refused to reconvene the MDR or reconsider its decision to expel her.

219. It is also notable that none of the information from Jane Doe's MET had been considered at the MDR on October 31, 2023, or at the preceding expulsion hearing, although such information would have been available via draft reports,

evaluator notes, and/or verbal reports from TAS staff regarding their respective testing and observations.

220. Even if TAS's accusations were taken as true, TAS's own evaluation and all related information regarding Jane Doe and her disabilities strongly indicated such actions were substantially and directly related to depression and anxiety, which would reasonably lead to the conclusion the behavior in question was a manifestation of Jane Doe's disabilities, and the law prohibited her expulsion.

November 7, 2023 Individualized Education Plan

221. TAS convened an individualized education plan (IEP) meeting on November 7, 2023 to determine Jane Doe's eligibility for an IEP and, if she was found eligible, to develop an initial IEP for her.

222. TAS found Jane Doe eligible for an IEP as a student with an emotional impairment.

223. The IEP subsequently developed, however, failed to adequately address Jane Doe's severe emotional impairment needs related to her depression and anxiety, as well as her academic needs related to her dyslexia or her significantly low cognitive performance.

224. In addition to copying the information from the evaluation report into the present levels of academic achievement and functional performance (PLAAFP) section of the IEP, the PLAAFP further noted, according to Jane Doe's September

2023 NWEA scores, she performed at a second-grade level in math, a fifth-grade level in reading, a second-grade level in language arts, and a third-grade level in science.

225. This places Jane Doe at least two grade levels behind in reading and four to five grade levels behind in math, science, and language arts.

226. Jane Doe's highest grade was a C- in Life Science, followed by a D- in Math.

227. Jane Doe was failing all other courses, yet the IEP only offered Jane Doe social work services for twenty to twenty-five minutes, one to three times a month (less than once a week) and resource room support for only forty-five to fifty-five minutes, four to five times per week.

228. Due to the expulsion, Jane Doe did not even receive the already insufficient, minimal amount of resource room support listed in her IEP.

229. Instead, TAS provided her with two, sixty-minute, in-person special education classes each week with special education teacher Tawney Collins. In addition, she received approximately 30 minutes per month of remote social work sessions.

230. These minimal academic and related services were grossly inadequate on their face to address Jane Doe's disability-related needs and denied Jane Doe access to her education, particularly considering TAS's insistence that Jane Doe was

a student who committed a severe threat against her peers.

231. From October 17, 2023 to the remainder of the school year, Jane Doe remained out of school, wrongly blamed for an action she did not commit, punished for behaviors which are direct manifestations of her disability, and placed in an Interim Alternative Education Setting (IAES) program insufficient to address her disabilities.

232. The IAES placement only exacerbated Jane Doe's disabilities, prompting Defendant Lizotte to make a referral to Community Mental Health after Jane Doe disclosed engaging in self-harm in one of their remote social work sessions.

***Administrative Due Process Complaint and Hearing***

233. On March 8, 2024, S.R. and T.R. filed a due process complaint against TAS with the Michigan Department of Education (MDE).

234. On April 5, 8, and 9, 2024, a hearing was held before an Administrative Law Judge (ALJ) with the Michigan Office for Administrative Hearings and Rules (MOAHR) to determine whether TAS denied Jane Doe a FAPE under IDEA.

235. Throughout the due process hearing, the following relevant testimony was given by various TAS staff:

236. Defendant Lizotte testified that, in the beginning of September, Jane Doe started coming down to her office two to three times a week, at either her own

request or by teacher referral, due to emotional distress, including crying and shaking.

237. Defendant Lizotte also testified to being aware of Jane Doe's depression and anxiety as of the beginning of September 2023.

238. Defendant Lizotte also testified that Jane Doe's alleged behaviors were a manifestation of her disabilities.

239. Defendant Tiffany testified to having multiple phone conversations and in-person meetings with Plaintiffs regarding Jane Doe's depression and anxiety throughout September and October, while Jane Doe was in school.

240. Defendant Tiffany also testified to being aware of Plaintiffs' concerns that Jane Doe's photo was still being shared among students per her multiple conversations with Plaintiffs.

241. Defendant Tiffany also testified to being aware of Jane Doe's repeated conflicts with peers as early as September 18, 2023.

242. Defendant Tiffany also testified to receiving the email from Jonathan Mejeur on October 11, 2023, in which he forwarded Melissa Kendall's email regarding her concerns, per Plaintiffs, that Jane Doe was being stalked, sexually exploited, and harassed by other students.

243. Defendant Tiffany also testified to being aware of Jane Doe's journal entries, in which she made comments such as, "The rumors don't ever stop when

they need to . . . and it's getting worse," and "It's killing me that they won't stop."

244. Defendant Tiffany also testified to Tawny Collins overseeing Jane Doe's tutoring while she was in IAES.

245. Defendant Tiffany did not testify to any concerns with Ms. Collins' competency or ability to service Jane Doe.

246. Laurel Greene, Jane Doe's math teacher, testified that Jane Doe's math class was right after lunch.

247. Ms. Greene further testified that Jane Doe would often come to class noticeably upset after lunch.

248. Ms. Greene also testified that, based on her limited knowledge and training, it was possible Jane Doe's alleged conduct was a manifestation of her disabilities.

249. Defendant Lizotte testified that she had shared information regarding Jane Doe's possible emotional impairment or cognitive impairment with Defendant Tiffany and Ms. Timo on October 31, during the MDR.

250. On direct examination, Ms. Collins testified that she had been working in special education for 25 years, all within TAS.

251. Ms. Collins testified that she had previously provided educational services to another student who had been expelled.

252. Ms. Collins testified that she had provided four hours a week of

instruction to the other student, and he had access to all of his classes via Google Classroom and interacted with his other teachers throughout the week.

253. Ms. Collins testified that she was unsure if Jane Doe had access to her Google Classrooms.

254. Ms. Collins testified that when she spoke with Defendant Danek, Defendant Danek advised Jane Doe was only working on special education goals.

255. Ms. Collins testified that many of Jane Doe's teachers did not use or put anything on Google Classroom.

256. Ms. Collins testified that even in Jane Doe's assignments had been placed on Google Classroom, Jane Doe lacked the ability to access these assignments.

257. Ms. Collins also testified that she generally was not responsible for grading all of a student's work, as she was for Jane Doe.

258. On cross-examination, Ms. Collins testified that Jane Doe required targeted remediation or intervention to address her severe reading deficits.

259. Ms. Collins further testified that it was difficult to provide these services to Jane Doe because of the District's available classrooms and scheduling policies.

260. Ms. Collins testified that in seventh and eighth grade, the directed study Jane Doe was placed in focused on completing classroom assignments to move the

student onto high school versus remediation services to address student deficits.

261. Ms. Collins testified that remediation skills were worked on in fifth and sixth grade, not seventh and eighth grade.

262. Ms. Collins testified that she believed Jane Doe was making some progress in their 1:1 60-minute tutoring sessions, while Jane Doe was on IAES, specifically due to the good relationship they had established.

263. Ms. Collins also testified that she did not believe the service minutes in Jane Doe's IEP were sufficient to meet her needs.

264. Ms. Collins also testified that she did not believe the service minutes for Jane Doe's IAES placement were sufficient to meet her needs.

265. Upon questioning from the Administrative Law Judge, Ms. Collins testified she had not been invited to Jane Doe's MDR.

266. Ms. Collins testified that if she had been, she would have found Jane Doe's alleged behaviors to be a manifestation of her disability due to the information already available to TAS.

267. Ms. Collins also testified that, if resource rooms were available within TAS, that would be the necessary placement for Jane Doe.

268. On re-direct examination, Ms. Collins testified that she disagreed with the TAS's special education model, specifically its failure to provide both push-in classrooms and pull-out resource rooms.

269. Ms. Collins also testified that the special education provider is normally invited to the MDR.

270. Ms. Collins testified that it was the first time she had ever not been invited to an MDR for a student on her case load.

271. Ms. Collins testified she also had prior experience with MDRs for students who were not yet eligible for special education services.

272. Ms. Collins also testified she was directed, by either Defendant Danek or Ms. Timo, the special education director, only to write goals she could work on with Jane Doe during their 1:1 sessions, two hours a week.

273. Notably, TAS's counsel was increasingly aggressive toward Ms. Collins on her re-direct versus her direct examination of Ms. Collins, following Ms. Collins' favorable testimony for Petitioners.

274. Counsel's re-direct included accusing Ms. Collins of being too friendly with Petitioners.

275. Counsel's re-direct also included asking Ms. Collins if, prior to the hearing, she had told anyone she was looking forward to coming and criticizing the District.

276. Ms. Timo was the District representative and present for the entirety of the due process hearing.

277. Ms. Timo testified last, immediately after Ms. Collins.

278. During her testimony, Ms. Timo made repeated disparaging remarks against Ms. Collins.

279. These included claiming she disagreed with Ms. Collins' reading goal, "but Tawny obviously believe[d] she could get her there," and "this teacher in particular was – is very set in her ways."

280. Upon information and belief, prior to listening to Ms. Collins' testimony, Ms. Timo had never expressed any concerns with Ms. Timo's competency or provision of services to Jane Doe or any other student.

281. Ms. Timo testified, as of December 1, 2023, she was aware that Ms. Collins was only working with Jane Doe on reading and language arts.

282. Upon information and belief, Ms. Timo never advised or asked Ms. Collins to work on other subjects with Jane Doe.

283. Ms. Timo testified to directing Ms. Collins to keep close documentation on Jane Doe's progress.

284. Ms. Timo further testified to receiving Ms. Collins' spreadsheet regarding her progress monitoring for Jane Doe.

285. Ms. Timo claimed Ms. Collins was still being asked to provide progress reports.

286. Upon information and belief, Ms. Timo never asked Ms. Collins to provide additional progress reports or further documentation after receiving Ms.

Collins' spreadsheet.

287. Ms. Timo claimed she expressed concerns about the service minutes to Ms. Danek following Jane Doe's lower state testing scores.

288. Ms. Timo testified that she thought Ms. Collins was told to spend more time on reading.

289. Ms. Timo also testified that she never offered Jane Doe additional time with Ms. Collins or another service provider to address her lack of progress.

290. Ms. Timo also testified that she made the final decision at the MDR since the team could not reach a consensus.

291. Ms. Timo further testified to having knowledge of Jane Doe's mental health struggles as of September 28, 2023.

292. Ms. Timo also testified to being aware of Jane Doe's journal entries.

293. On direct examination, Ms. Timo claimed that Jane Doe entered the bathroom the day of the bomb threat all smiley and happy.

294. On cross-examination, Ms. Timo acknowledged this was not documented in the written reports regarding the video footage of the incident.

295. When questioned, all TAS witnesses, including Defendant Lizotte, Defendant Tiffany, Ms. Greene, and Ms. Timo, testified they had never seen or received a copy of Jane Doe's completed threat assessment prior to the due process hearing.

296. Ms. Timo testified she believed the document resided with Ms. Danek.

297. Following the conclusion of the due process hearing, on or about April 16, 2024, the parties fully executed a settlement agreement resolving Plaintiffs' claims solely under the IDEA and MARSE.

298. On or about April 18, 2024, the ALJ dismissed with prejudice all claims brought pursuant to IDEA and MARSE, due to the parties' having reached an agreement resolving such claims.

***Jill Moe's[15] Additional Sexual Harassment of Jane Doe***

299. Jill Moe, another perpetrator of sexual harassment against Jane Doe, was also a seventh-grade student at Tawas Elementary School during the 2023-2024 school year.

300. On April 18, 2024, Jane's previous teacher, Tawny Collins, contacted Plaintiffs and advised them that multiple students had told her that Jill had re-circulated Jane Doe's nude photos the prior week.

301. This made Jane Doe feel defeated, like the situation with her photos was never going to end and TAS was never going to address the harassment.

302. At this time, it had been six months since Jane Doe had even attended TAS in person and yet the photos were circulating again.

303. Ms. Collins reported the incident to Defendants Danek, Tiffany, and

[15] Jill Moe is a Pseudonym.

Lizotte on April 18, 2024.

304. In response, TAS did nothing.

305. Once again, TAS did not provide Plaintiffs or Jane Doe with any information about TAS's Title IX Policy, reporting procedures, supportive measures, the identity of the TAS Title

IX Coordinator, or their right to report the incident to the U.S. Department of Education, U.S. Department of Justice, or the Michigan Department of Civil Rights.

306. TAS did not initiate an investigation into the report.

307. If not for the communication from Ms. Collins, Plaintiffs would never have known that the nonconsensual intimate image abuse had restarted against Jane Doe.

***Breach of Settlement Agreement and Retaliation Concerns, Remainder of the 2023-2024 School Year***

308. Pursuant to the settlement agreement signed by the parties, fully executed on April 17, 2024, TAS was to provide Jane eight hours of academic instruction and 50 minutes of in-person social work services for the remainder of the 2023-2024 school year.

309. All service providers were to "keep detailed logs that include the date and time of the sessions, the specially designed instruction (i.e. curriculum or methodology and any individualized modifications) provided to [Jane], and [Jane]'s specific progress toward her IEP goals and in the general education curriculum."

310. These logs were to be provided to Plaintiffs every four weeks.

311. Further, TAS was to "retain a mutually agreed upon expert in special education and IEP development, to participate in the development of an educationally meaningful and legally compliant IEP for Student for the 2024-2025 school year."

312. TAS was to convene the IEP meeting and finalize the IEP no later than June 6, 2024.

313. On or about April 18, 2024, Plaintiffs learned from Ms. Collins that she was being replaced and that all of Jane Doe's academic services would be provided remotely.

314. As of this conversation with Ms. Collins, Plaintiffs had not received any direct communications from Defendants regarding Jane Doe's educational services.

315. On April 25, 2024, Ms. Timo, special education director, emailed Plaintiffs, confirming Ms. Collins would be replaced by Denise Leibold and Laurel Greene.

316. Ms. Timo's email was silent as to the formatting of the academic services, whether remote or in-person.

317. Notably, Ms. Tawny Collins had provided special education services to Jane Doe since November 2023 with no complaints or concerns expressed by either

Plaintiffs or Defendants.

318. Plaintiffs responded to Ms. Timo that same day, expressing their concern of replacing Ms. Collins, with whom Jane Doe had established a positive working relationship.

319. Plaintiffs expressed significant concern that, in light of Jane Doe's emotional impairment and inability to develop and maintain appropriate relationships, the replacement was counterproductive and would have a negative impact on Jane Doe's disability.

320. Plaintiffs expressed a willingness to work with Defendants regarding any scheduling concerns to allow Ms. Collins to continue providing two hours a week, Ms. Greene to provide two hours, and Ms. Leibold to provide the remaining four hours.

321. On April 25, 2024, Ms. Timo responded, claiming Ms. Collins had been offered the opportunity to continue working with Jane Doe and declined it.

322. Ms. Timo further claimed both Ms. Collins and Defendants felt Jane Doe would benefit from a single special education teacher.

323. Upon information and belief, these claims by Ms. Timo were misleading and inaccurate.

324. Upon information and belief, Defendants offered Ms. Collins the opportunity to continue working with Jane Doe, but only if she agreed to

325. significantly increased reporting requirements due to "concerns" about her previous performance.

326. Upon information and belief, Defendants also advised Ms. Collins she would no longer be able to provide in-person services, but that the services would have to be provided remotely.

327. Upon information and belief, Ms. Collins disagreed with Defendants' restrictions on her ability to teach Jane Doe as inappropriate to meet Jane Doe's disability-related needs, and that is why she declined the opportunity to continue working with Jane Doe.

328. Upon information and belief, Ms. Collins also disagreed that Jane Doe would benefit from just one teacher providing special education services.

329. Defendants did not disclose to Plaintiffs that neither Ms. Leibold nor Ms. Greene would not be providing any in-person instruction prior to services starting.

330. Plaintiffs only learned that Jane Doe's instruction would be remote one week prior to services starting through a conversation with Ms. Leibold.

331. Jane Doe's first full week of academic instruction began on May 2, 2024.

332. After one week of fully remote classes, on Friday, May 6, 2024, Plaintiffs emailed Ms. Timo advising Jane Doe would not be able to fully benefit

from all 8 hours of her academic instruction being provided remotely.

333. Plaintiffs noted that, due to Jane Doe's difficulty engaging in the virtual format, Ms. Leibold had to end her first session a half hour early.

334. Plaintiffs expressed concern that Defendants failed to inform them about the fully remote nature of the academic services prior to starting instruction.

335. Plaintiffs noted that, based on Jane Doe's cognitive and academic achievement scores, it was clear she required in-person instructional time.

336. Plaintiffs reiterated their request that Defendants reinstate Ms. Collins as a service provider for Jane Doe to provide two hours of in-person instruction per week.

337. Plaintiffs acknowledged they had previously spoken with Ms. Collins about resuming her services and Ms. Collins advised she was willing to do so, just not in a remote format.

338. Plaintiffs again expressed their willingness to work with the District regarding scheduling.

339. On May 9, 2024, Ms. Timo advised Plaintiffs she had spoken with Ms. Collins and claimed Ms. Collins again declined to commit to two hours a week of in-person instruction.

340. Instead, Ms. Timo offered for Ms. Greene to provide her instructional services in person.

341. Plaintiff T.R. spoke with Ms. Collins' about the District's claim that she again refused to commit to providing Jane Doe in-person instruction for two hours a week.

342. Ms. Collins stated Defendants were harassing her and giving her a very hard time at the school about helping Jane Doe.

343. While Plaintiffs appreciated the opportunity for Jane Doe to receive in-person instruction from Ms. Greene, they remained concerned that this was still insufficient in-person instructional time to meet Jane Doe's needs.

344. Unlike Ms. Collins, who was a certified special education teacher, Ms. Greene was a general education teacher whose services focused exclusively on math.

345. Plaintiffs received one set of service logs on or about May 28, 2024.

346. The service logs provided to Plaintiffs were incomplete pursuant to the settlement agreement.

347. The social work service logs failed to provide specific data toward Jane Doe's progress toward her IEP goals and failed to identify the specific curriculum or methodology utilized during Jane Doe's social work sessions.

348. The academic service logs failed to include the time of the sessions, the specially designed instruction provided to Jane Doe, or Jane Doe's specific progress toward her IEP goals.

349. While the service log provided some information regarding Jane Doe's

progress towards the general education curriculum, it was done via a running list of assignments given to Jane Doe and general information on skills mastered or being addressed.

350. Following the execution of the settlement agreement, Plaintiffs proposed three experts in special education to facilitate the IEP meeting, two of whom held PhDs related to education, experience working for school districts as special education administrators, experience training others in IEP development, and significant publications on special education.

351. One of the experts proposed by Plaintiffs, Dr. David Bateman, also had prior experience serving as a special education hearing officer and developing the training modules on IEP development for the U.S. Department of Education.

352. None of the fees of the experts proposed by Plaintiffs exceeded $150.00 an hour.

353. TAS rejected each of these experts.

354. Notably, despite Plaintiffs request to retain him as the expert for the IEP meeting, TAS expressed an interest in retaining Dr. Bateman to train its staff in IEP development at some unspecified later date.

355. TAS proposed their own three experts, none of whom held more than a master's level in education.

356. None of the experts proposed by TAS had any experience beyond

special education administration in Michigan.

357. None of the experts proposed by TAS had any publication or significant training experience related to IEP development and special education.

358. Plaintiffs reiterated their request that TAS approve Dr. David Bateman as the expert to facilitate the IEP meeting, given his extensive credentials and the TAS's expressed interest in having him train TAS staff.

359. TAS again denied this request and instead proposed a new expert, Cindy Shinsky, that they insisted on moving forward with.

360. While Ms. Shinsky did have a doctorate degree and had worked in special education for over 30 years, her entire work experience consisted primarily of simply facilitating IEP meetings and supervising the provision of FAPE.

361. Ms. Shinsky also did not have a single publication to her name and had never provided any trainings of IEPs.

362. Plaintiffs identified the significant discrepancies between Ms. Shinsky's and Dr. Bateman's qualifications, reiterating their request that the District approve Dr. Bateman.

363. The District again refused and insisted on utilizing Ms. Shinsky.

364. Ultimately, Plaintiffs agreed to allow the District to invite Cindy Shinsky to facilitate the IEP meeting.

365. In agreeing to move forward with Ms. Shinsky, Plaintiffs expressly

noted their disagreement that she qualified as an expert in developing legally compliant and educationally meaningful IEPs as required by the settlement agreement.

366. Due to their disagreement with the chosen expert and to ensure an appropriate IEP for Jane Doe moving forward, Plaintiffs advised the District they would be bringing Dr. Kurt Hulett, who had served as their expert during the due process hearing and was one of the proposed experts pursuant to the settlement agreement, as their educational advocate for the IEP meeting.

367. Dr. Hulett is a special education consultant who provides trainings and advise to companies and school districts regarding how to serve students with disabilities.[16]

368. Dr. Hulett authored the textbook, "Legal Aspects of Special Education," and was the co-author of the text, "Miles to Equity," with Dr. Jim Terry.

369. Although the IEP meeting was initially to be held May 30, 2024, TAS kept unilaterally adjourning the meeting.

370. On or about June 20, 2024, Defendants' counsel notified Plaintiffs that they had identified a different expert[17] to participate in the IEP meeting, replacing Ms. Shinsky.

---

[16] *Kurt Hulett, Ph.D.*, COUNCIL FOR EXCEPTIONAL CHILDREN, https://exceptionalchildren.org/about-us/board-directors/kurt-hulett-phd (last visited Aug. 28, 2026).
[17] Plaintiffs do not recall the name of this expert.

371. Defendants' counsel also advised Plaintiffs the IEP meeting would now be held July 15, 2024.

372. Plaintiffs had no participation in choosing the new expert and did not agree that he or she was an expert in special education and IEP development, pursuant to the settlement agreement.

373. Upon information and belief, the new expert was even less qualified than Ms. Shinsky.

374. Plaintiffs never agreed to another extension of the IEP meeting.

375. Defendants did convene the IEP team on July 15, 2024, but were unable to finalize the IEP due to having insufficient data and information regarding Jane's needs.

376. Defendants reconvened the IEP meeting on August 5, 2024.

377. The immediately preceding Friday, August 2, 2024, Plaintiffs found out from the mediator that TAS was bringing their attorney to the IEP meeting.

378. Plaintiffs had no time to secure counsel to attend the IEP team meeting with them on August 5, 2024.

379. The IEP meeting began at 9am and was still ongoing as of 12pm, three hours after it began.

380. Dr. Hulett was not available past 12pm, so Plaintiffs asked for a continuance of the IEP meeting to allow his continued participation.

381. TAS refused to discontinue and reschedule the meeting to accommodate Plaintiff's request to continue the meeting at a later, so Plaintiffs could continue having their advocate present and/or obtain counsel.

382. TAS told Plaintiffs they were finishing the IEP that day with or without Plaintiff's continued participation.

383. Under this threat, Plaintiffs agreed to continue participating in the meeting without Dr. Hulett.

384. Plaintiffs expressly advised TAS that they felt intimidated without having an advocate present, yet they had no additional support and no time to secure their own attorney.

***TAS's Deliberate Indifference to Reports of Sexual Misconduct by John Roe, John Poe, and Jill Moe***

385. Upon information and belief, TAS had been aware of sexual misconduct by John Roe and John Poe since August 2023 but failed to take any action to address their misconduct, remedy the hostile environment at Tawas Middle School, or protect Jane Doe.

386. Upon information and belief, TAS had been aware of the sexual misconduct by Jill Moe since April 18, 2023, but failed to take any action to address the misconduct, remedy the hostile environment at Tawas Middle School, or protect Jane Doe.

387. Upon information and belief, TAS staff were aware of the various

sexual harassment incidents but took no action to address the repeated sexual harassment incidents and never initiated a Title IX investigation at any time during the 2023-2024 school year, the 2024-2025 school year, the 2025-2026, school year, or to date in the 2026-2027 school year.

388. Pursuant to both Title IX and its own policies, TAS had the ability to discipline Roe and Poe, but did not.

***TAS's Violations of Jane Doe's Rights Under 34 C.F.R. Part 106***

389. Federal Title IX regulations require:

> A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent. A recipient is deliberately indifferent only if its response to sexual harassment is clearly unreasonable in light of the known circumstances.

34 C.F.R. § 106.44(a).

390. TAS's response to Jane Doe's report of sexual harassment was deliberately indifferent.

TAS Failed to Provide Jane Doe Notice of Her Right to File a Formal Title IX Complaint Upon Receipt of Notice that She Was a Victim of Sex Discrimination

391. As outlined previously in this Complaint, upon information and belief, TAS first became aware that Jane Doe was a victim of sexual harassment perpetrated by John Roe and John Poe sometime in late August 2023.

392. TAS became further aware that Jane Doe was a victim of sexual harassment perpetrated by Jill Moe on April 18, 2023.

393. TAS never provided any information to Jane Doe or her parents about how to file a formal Title IX complaint at any time during the 2023-2024 school year, the 2024-2025 school year, the 2025-2026 school year, or to date in the 2026-2027 school year.

394. TAS never identified its Title IX Coordinator to Plaintiffs or to Jane Doe.

395. No one ever explained the process for filing a formal complaint to Plaintiffs or to Jane Doe.

396. TAS's actions and inactions were clearly unreasonable in light of the known circumstances.

TAS Failed to Investigate All Allegations of Sexual Misconduct

397. 34 C.F.R. § 106.45(a)(1) requires: "A recipient's grievance process must—…(ii) Require an objective evaluation of all relevant evidence…."

398. Failing to include an allegation of an act of sexual assault in a Title IX investigative report, or failing to conduct any investigation at all, by definition, results in a failure to objectively evaluate all relevant evidence.

TAS Failed to Provide Jane Doe with Appropriate Supportive Measures

399. 34 C.F.R. § 106.44(a) requires:

> A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in §106.30 to a complainant…

400. 34 C.F.R. § 106.30 defines supportive measures as follows:

> Supportive measures means non- disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

401. At no time did any TAS employee contact Jane Doe or Plaintiffs to offer supportive measures.

402. Because TAS never contacted Jane Doe or Plaintiffs to offer supportive measures, Jane Doe's equal access to TAS's education program was never restored or preserved.

403. TAS's failure to offer supportive measures was clearly unreasonable in light of the known circumstances.

***TAS's Failures Under Section 504, Title II of the ADA, and PDCRA***

404. As outlined previously in this Complaint, upon information and belief, TAS had knowledge that Jane Doe was a student with a disability and failed to provide her with the appropriate supports to access her classroom instruction.

405. In addition to the lack of access to classroom instruction, Jane Doe suffered from the loss of appropriate social interaction due to TAS's failure to provide necessary auxiliary aids and services, and to address the ongoing bullying and harassment of Jane Doe.

406. TAS further denied Jane Doe the opportunity to participate in extra-curricular activities offered to non-disabled students.

407. TAS retaliated against Jane Doe by removing Ms. Collins as a service provider following execution of the settlement agreement, despite knowledge that doing so would have a negative impact on Jane's emotional impairment.

408. TAS further retaliated against Jane Doe by replacing her in-person special education services with entirely remote special education services following execution of the settlement agreement, despite knowledge that doing so would have a negative impact on Jane's ability to benefit from her instructional services due to her disabilities.

409. The Tawas Board of Education is responsible for setting policies for the District and therefore is responsible for any injuries that Plaintiffs sustained.

410. The Tawas Board has sufficient powers regarding the hiring, firing, and supervision of Tawas employees to be held liable for their acts.

411. Defendants' acts have deprived Jane Doe of her equal opportunity to receive the benefits that other participants in Defendant's programs and services enjoy.

412. Defendants' acts regarding Jane's education following the settlement of the due process complaint have been retaliatory in response to Plaintiff's exercising the procedural safeguards under IDEA.

413. Defendants' acts were knowing and intentional.

414. Defendants acted with deliberate indifference toward Jane's federally protected rights.

415. As a result of Defendants' conduct, Jane Doe has experienced severe emotional distress, such as humiliation, frustration, anxiety, sadness, hopelessness, isolation, and other forms of mental and emotional anguish.

***The Effects of TAS's Failures on Jane Doe***

416. Following John Roe and John Poe's sexual harassment of Jane Doe, her mental and emotional health increasingly suffered.

417. As outlined previously in this Complaint, due to the sexual harassment, Jane Doe spent an increasing amount of time outside of the classroom.

418. Jane Doe also increasingly requested Plaintiffs pick her up from school

early and required them to drive her home from school every day versus riding the bus.

419. While Jane Doe's social-emotional health had slowly started to improve with counseling and not being in school, Jane immediately regressed following Jill's sexual harassment in April 2018 and the subsequent increased harassment by peers related to the re-sharing of her nude photos.

420. Throughout both the 2024-2025 and 2025-2026 school years, Jane Doe continued to suffer significant harassment from peers related to the previous sharing and resharing of her nude photos.

421. On one specific occasion, another student urinated on Jane Doe's shoes.

422. Although aware of the ongoing harassment, Defendants not only failed to address it, but instead continued to treat Jane Doe as a perpetrator rather than a victim.

423. Ultimately, Jane Doe was forced to withdraw from Tawas High School to attend the alternative high school as of March 2026.

424. Jane Doe had previously been diagnosed with depression and anxiety due to the sexual harassment. These diagnoses have been exacerbated by TAS's failures.

425. Jane Doe continues attending counseling and taking medication to support her mental health.

426. Jane Doe's diagnoses have significantly affected her daily routines.

a. She experiences triggers such as smells, sounds, or someone simply bumping into her.

b. When these triggers occur, Jane Doe experiences a complete shutdown. If such a trigger happens at school, Plaintiffs must leave work to pick up Jane Doe.

c. Plaintiffs will try to talk Jane Doe through these shutdowns, but sometimes the only way to for Jane Doe to get through the experience is to completely remove herself from a situation.

d. Jane Doe has also become apprehensive to speak to adults or go to them for help.

427. Academically, Jane Doe continues to struggle with grade level math skills, scoring at the third percentile on the NWEA, per her June 2025 IEP.

428. For reading, Jane Doe continues to read below grade level, which directly interferes with her ability to understand class content.

429. Jane Doe also continues to struggle significantly in writing, scoring at only the sixth percentile on the NWEA and demonstrating weaknesses in all areas of writing.

430. Jane Doe continues to struggle to spell and write anything, preferring text communication because it autocorrects for her.

431. TAS's failures have significantly negatively affected Jane Doe in numerous additional ways.

a. Jane Doe has little to no trust in adults due to the number of adults who failed her when she was at Tawas Middle School.

b. TAS failed to provide Jane Doe with adequate supportive measures, which caused her to feel like the system failed her.

c. Jane Doe now isolates herself from her peers to try to keep herself safe.

d. Jane Doe now has days where she is paralyzed with fear and unable to withstand any human interactions.

e. Her education has been deeply negatively impacted; she cannot attend the general public school.

f. Her family relationships have also suffered because of her inability to be around other people.

g. Jane Doe has lost out on the close friendships she had at TAS and misses her friends there.

h. She had to leave everything and everyone she cared about in her school building and does not understand why she and not her assailants had to suffer punishment.

i. Jane Doe still has panic attacks and withdraws due to her

overwhelming emotions.

j. Jane Doe has become negatively sensitized to human touch due to repeated sexual harassment and has stopped accepting hugs. Even a simple arm around her shoulder can trigger her central nervous system and cause a negative spiral into fear and withdrawal. Jane Doe does not even let family members hug her unless that is the only way to calm her anxiety.

k. Jane Doe has also started to question her self-worth and has begun exhibiting obsessive-compulsive behaviors to try to exert some level of control over her environment and her body.

l. Jane Doe has stopped attending church.

m. Jane Doe has zero close friends and spends most of her time isolated in her room.

432. Jane Doe fears a return to TAS.

a. S.R. and T.R. are terrified of allowing Jane Doe to do so because they do not trust that TAS will keep her safe.

b. Jane Doe fears a return due to Defendants making her feel like the sexual harassment and discriminatory treatment was her fault.

433. Jane Doe's separation from her friends and her community causes her ongoing negative emotional, psychological, and physical effects.

434. The cost of traveling to and from school and medical appointments, medication, and medical visits have cost Plaintiffs approximately $6,500 over the last three years.

435. Due to Defendants' breach of the settlement agreement, and their discrimination and retaliation against Jane Doe, Plaintiffs were forced to retain Dr. Kurt Hulett as advocate at their own expense of $9,345.00, to ensure Jane Doe's disabilities were appropriately addressed and accommodated within her IEP moving forward.

**COUNT I**
**Violation of Title IX**
**Deliberate Indifference to Sex Discrimination**
**20 U.S.C. § 1681, *et seq*.**
**(The TAS Defendants)**

436. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

437. Plaintiffs allege violations of Title IX due to Defendants' deliberate indifference to the sex discrimination they knew she was experiencing at TAS.

438. From approximately June 2023 to present, Jane Doe was subjected to sex discrimination consisting of sexual harassment and stalking committed by fellow TAS students on TAS property.

439. From approximately September 2023 and to present, Defendants engaged in repeated acts of deliberate indifference to Jane Doe's multiple reports of

sexual discrimination perpetrated by fellow students as outlined previously in this Complaint, by failing to timely respond to her reports of sexual misconduct, failing to provide her with information about supportive measures, failing to provide her with information on how to make a formal complaint of sex discrimination, and failing to adequately train and supervise their staff with respect to the handling of Title IX complaints.

440. Defendants failed to take immediate, effective remedial steps to resolve Jane Doe's complaints of sex discrimination and instead acted with deliberate indifference to her claims.

441. Defendants' lack of action and failure to appropriately respond to Jane Doe's reports caused her to experience further sexual harassment, stalking, and sexual assault.

442. Defendants persisted in their actions and inactions despite having actual knowledge of the discrimination to which Jane Doe was subjected.

443. The ongoing sexual harassment, stalking, and sexual exploitation that Jane Doe experienced, and the subsequent Title IX failures by Defendants, were so severe, pervasive, and objectively offensive that Jane Doe was denied equal access to TAS's educational opportunities and benefits.

444. Defendants engaged in a pattern and practice of behavior designed to discourage and dissuade students who had experienced sex discrimination from

seeking assistance and protection.

445. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT II**
**Violation of Title IX**
**Deliberate Indifference to a Known Hostile Environment**
**20 U.S.C. § 1681, *et seq*.**
**(The TAS Defendants)**

446. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

447. Plaintiffs allege violations of Title IX due to Defendants' cultivation and perpetuation of a sexually hostile environment against Jane Doe.

448. Through the abuse described previously in this Complaint, TAS students created an abusive and sexually hostile educational environment on Tawas Middle School's campus that impeded and effectively denied Jane Doe and other TAS students' equal access to educational opportunities and benefits.

449. Defendants are liable for the abusive and hostile educational environment at Tawas Middle School because Defendants had actual knowledge of

Jane Doe's abusers' acts of sex discrimination but allowed them to continue to have unfettered access to Jane Doe and other students.

450. Defendants are also liable for their failure to remedy the hostile educational environment experienced by Jane Doe by failing to offer her appropriate supportive measures and accommodations that could have provided equal access to educational opportunities and benefits and by ailing to remedy a known sexually hostile environment.

451. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

## COUNT III
**Violation of Title IX**
**Retaliation**
**20 U.S.C. § 1681, *et seq*.**
**(The TAS Defendants)**

452. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

453. Plaintiffs allege violations of Title IX due to Defendants' cultivation and perpetuation of retaliation against Jane Doe.

454. Under Title IX, "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by . . . this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7(e); 34 C.F.R. § 106.71 (Title IX) (incorporating 34 C.F.R. §100.7(e) by reference).

455. Following Plaintiffs filing of a due process complaint against TAS and the execution of a settlement agreement, TAS retaliated against Jane Doe by denying her continued access to services by a qualified and known special education teacher and denying her access to continued in-person special education services.

456. Defendants are liable for the retaliation against Jane Doe because Defendants had actual knowledge that Plaintiffs had engaged in protected activity and took deliberately harmful actions against Jane Doe in response.

457. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT IV**
**Denial of Substantive Due Process**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(All Defendants)**

458. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

459. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1.

460. Defendants were state actors and at all relevant times were acting under color of law.

461. Defendants failed to comply with the administrative requirements of Title IX by failing to properly respond to Jane Doe's reports of sex discrimination, failing to provide her with information about supportive measures, failing to ensure that the limited supportive measures they provided were actually implemented, failing to timely provide her with information on how to make a formal complaint of sex discrimination, and failing to adequately train and supervise their staff with respect to the handling of complaints of sex discrimination.

462. Defendants' actions and inactions caused Jane Doe to continue to be the victim of ongoing sex discrimination and to have to leave Tawas High School not once but *twice* following her return to the building in August. Even at the

alternative high school, Jane Doe faces ongoing sex harassment and discrimination resulting from TAS's deprivation of her liberty interest in her bodily integrity and her property interest in her education.

463. Defendants' actions and inactions resulted from its interest in covering up sexual misconduct; in other words, this selective treatment was not justified by a sufficient purpose under the law.

464. Jane Doe's right to substantive due process under the law is one of which reasonable officials in Defendants' positions would have known.

465. Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

466. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

## COUNT V
## Denial of Procedural Due Process
## 42 U.S.C. § 1983 and the Fourteenth Amendment
## (All Defendants)

467. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

468. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1.

469. Defendants failed to comply with the administrative requirements of Title IX by failing to properly respond to Jane Doe's reports of sex discrimination, failing to provide her with information about supportive measures, failing to ensure that the limited supportive measures they provided were actually implemented, failing to timely provide her with information on how to make a formal complaint of sex discrimination, and failing to adequately train and supervise their staff with respect to the handling of complaints of sex discrimination.

470. Defendants' actions and inactions caused Jane Doe to continue to be the victim of ongoing sex discrimination and to have to leave Tawas High School not once but *twice* following her return to the building in August 2024. Even at the alternative high school, Jane Doe faces ongoing sex harassment and discrimination, resulting in a deprivation of her liberty interest in her bodily integrity and her property interest in her education.

471. Defendants' failure to comply with the administrative requirements of Title IX deprived Jane Doe of her procedural due process right to be heard prior to deprivation of her liberty and property interests.

472. Jane Doe's right to procedural due process under the law is one of which reasonable officials in Defendants' positions would have known.

473. Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

474. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT VI**
**Denial of Equal Protection**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**(All Defendants)**

475. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

476. Plaintiffs allege violations of 42 U.S.C. § 1983 against Defendants due to discrimination on the basis of sex that denied Plaintiffs equal protection under the law in violation of the Equal Protection Clause of the Fourteenth Amendment.

477. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. §1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1.

478. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to intermediate scrutiny.

479. Defendants' discrimination against Jane Doe on the basis of sex was not substantially or rationally related to any legitimate government interest.

480. Defendants subjected Jane Doe to violations of her liberty and property interests by, failing to properly respond to Jane Doe's reports of sex discrimination, failing to provide her with information about supportive measures, failing to ensure that the limited supportive measures they provided were actually implemented, failing to timely provide her with information on how to make a formal complaint of sex discrimination, and failing to adequately train and supervise their staff with respect to the handling of complaints of sex discrimination.

481. Defendants' discrimination against Jane Doe on the basis of sex endangered her safety, privacy, security, and well-being.

482. Defendants' actions and inactions deprived Jane Doe of her right to equal dignity, liberty, and autonomy by treating her as a second-class citizen at her school.

483. This selective treatment was related to TAS's interest in covering up sexual misconduct; in other words, this selective treatment was not substantially or

rationally related to any legitimate government interest.

484. It is clearly established that failing to properly investigate allegations of sex discrimination violates the Equal Protection clause.

485. First, "a State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).

486. More recently, in *Fitzgerald v. Barnstable School Committee*, parents brought suit under § 1983, alleging that school officials' inadequate response to peer-on-peer sexual harassment of their daughter constituted sex discrimination in violation of the Equal Protection Clause. 555 U.S. 246, 249–50 (2009).

487. The Supreme Court held that "Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights." *Id.* at 258. Thus, "§ 1983 suits based on the Equal Protection Clause remain available to plaintiffs alleging unconstitutional gender discrimination in schools." *Id.*

488. Jane Doe's right to equal protection under the law is one of which reasonable officials in Defendants' positions would have known.

489. Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

490. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

## COUNT VII
## Retaliation
## 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution
## (Defendants Klinger, Lizotte, Danek, and Tiffany)

491. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

492. Plaintiffs allege violations of 42 U.S.C. § 1983 against Defendants due to deprivation of their constitutional right to free speech and expression via retaliatory actions against Jane Doe to impair or deny her the right to access her education.

493. Plaintiffs engaged in constitutionally protected speech when they filed a due process complaint and participated in a due process hearing against Defendants.

494. Defendants took adverse action against Plaintiffs by removing Jane Doe's special education teacher and denying her access to any in-person special

education services.

495. Defendants took such actions against Plaintiffs because of and in response to Plaintiffs' protected speech.

496. To state a First Amendment retaliation claim, plaintiffs must establish that: (1) they engaged in constitutionally protected speech; (2) defendants took adverse action against them that would deter a person of ordinary firmness from continuing to engage in that speech; and (3) the adverse action was motivated, at least in part, by the protected speech. *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017).

497. Defendants took adverse action against Plaintiffs in retaliation for their due process complaint and testimony at the due process hearing, intending to deter Plaintiffs from further speech on matters of public concern.

498. Plaintiffs' rights to free speech and expression under the law is one of which reasonable officials in Defendants' positions would have known.

499. Defendants, under color of law, caused Plaintiffs to be subjected to the deprivation of their rights under the Constitution of the United States.

500. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation,

embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT VIII**
**Disability Discrimination**
**Violation of Section 504 of the**
**Rehabilitation Act, 29 U.S.C. § 794**
**(The TAS Defendants)**

501. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

502. Section 504 of the Rehabilitation Act of 1973 ("Section 504") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

503. A person is an "individual with a disability" under Section 504 if that person experiences "a physical or mental impairment which substantially limits one or more major life activities." 29 U.S.C. § 705(20)(B) (incorporating definition in 42 U.S.C. § 12102 by reference).

504. "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

505. In the context of public K-12 education, a "qualified person with a disability" under Section 504 includes an individual with a disability of an age during which persons who do not experience disabilities are provided K-12 public education. 34 C.F.R. § 104.3(l)(2).

506. A "program or activity" under Section 504 includes "a department, agency, special purpose district, or other instrumentality of a State or of a local government" that receives federal financial assistance. 29 U.S.C. § 794(b)(1)(A).

507. Section 504's K-12 education regulations apply to "preschool, elementary, secondary, and adult education programs or activities that receive Federal financial assistance and to recipients that operate, or that receive Federal financial assistance for the operation of, such programs or activities." 34 C.F.R. § 104.31

508. Defendants TAS and TAS Board are recipients of federal financial assistance and operate a public elementary or secondary education program or activity. Therefore, they are covered entities under 29 U.S.C. § 794.

509. Jane Doe is a person with a disability within the meaning of 29 U.S.C. § 794.

510. Defendants intentionally discriminated against Jane Doe by failing to provide the reasonable modifications and the auxiliary aids and services needed to ensure equal access to her education, in violation of 29 U.S.C. § 794.

511. Defendants intentionally discriminated against Jane Doe by excluding her from participation in and denying her the benefits of Defendants' programs or activities solely because of her disabilities, in violation of 29 U.S.C. § 794 and its implementing regulations.

512. Through the acts and omissions set forth herein, Defendants discriminated against Jane Doe on the basis of disability in violation of Section 504, including, but not limited to, the following:

a. Defendants denied Jane Doe the opportunity to participate in the benefits of public education equal to that afforded to other similarly situated students, including having access to educational instruction in an amount equal to that of her same-age, non-disabled peers;

b. Defendants failed to provide Jane Doe an opportunity to participate in or benefit from the public education equal to that afforded to other similarly situated students;

c. To the extent Defendants provided any public educational services to Jane Doe during the time pertinent to this Complaint, such services were not appropriate or reasonably calculated to provide Jane Doe an opportunity to participate in or benefit from the public education equal to that afforded other public-school students; and

d. Defendants failed to educate Jane Doe, or provide for Jane Doe's

education, with nondisabled students to the maximum extent appropriate to Jane Doe's needs.

513. Defendants have otherwise intentionally discriminated against Jane Doe in violation of Section 504.

514. Defendants discriminated against Jane in violation of Section 504 regulations, based upon the foregoing allegations and such other violations of Section 504 as may be discovered during the course of this matter. All such claims are hereby reserved.

515. Defendants' violations of Section 504 have caused, and continue to cause, actual and proximate harm to Jane Doe.

516. At the time Defendants violated Jane Doe's rights under Section 504 as set forth above, Defendants, and their respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

517. Defendants acted with reckless or callous indifference to Jane Doe's federal protected rights under Section 504.

518. Defendants exhibited bad faith and/or gross misjudgment in engaging in the conduct that violated Jane Doe's rights under Section 504.

519. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited

to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT IX**
**Retaliation**
**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(The TAS Defendants)**

520. Plaintiffs incorporate by reference all previous paragraphs of the Complaint herein.

521. Under Section 504, "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by . . . this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7(e); 34 C.F.R. § 104.61 (incorporating 34 C.F.R. §100.7(e) by reference).

522. Following Plaintiffs filing of a due process complaint against TAS and the execution of a settlement agreement, Defendants retaliated against Jane Doe by denying her continued access to services by a qualified and known special education teacher and denying her access to continued, in-person special education services.

523. Defendants are liable for the retaliation against Jane Doe because

Defendants had actual knowledge that Plaintiffs had engaged in protected activity and took deliberately harmful actions against Jane Doe in response.

524. Defendants' violations of Section 504 have caused, and continue to cause, actual and proximate harm to Jane Doe.

525. At the time Defendants violated Jane Doe's rights under Section 504 as set forth above, Defendants, and their respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

526. Defendants acted with reckless or callous indifference to Jane Doe's federal protected rights under Section 504.

527. Defendants exhibited bad faith and/or gross misjudgment in engaging in the conduct that violated Jane Doe's rights under Section 504.

528. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT X**
**Disability Discrimination**
**Violation of Title II of the Americans**
**With Disabilities Act, 42 U.S.C. §§ 12131, *et seq.***
**(The TAS Defendants)**

529. Plaintiffs incorporate by reference all previous paragraphs of the Complaint herein.

530. Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. Part 35.

531. Disability discrimination under Title II also includes a public entity's failure to make reasonable modifications necessary to avoid disability discrimination. 28 C.F.R. § 35.130(b)(7).

532. ADA regulations specify, *inter alia*, that it is unlawful discrimination for a public entity either directly or through contractual, licensing, or other arrangements to:

a. Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

b. Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not

equal to that afforded to other similarly situated students;

c. Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result,

to gain the same benefit, or to reach the same level of achievement as that provided to others,

d. Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

e. Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. § 35.130(b)(1).

533. Under the ADA regulations, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of

the public entity's program with respect to individuals with disabilities . . ..” 28 C.F.R. § 35.130(b)(3).

534. “Individual with Disability” and “major life activities” have the same meaning under Title II of the ADA and under Section 504 as set forth above. *Compare* 34 C.F.R. § 104.3 *to* 28 C.F.R. § 35.108.

535. Under Title II of the ADA, a public entity includes any state or local government and any “department, agency, special purpose district, or other instrumentality of a State or States or local government.” 28 C.F.R. § 35.104.

536. “Qualified individual with a disability” under ADA Title II means “an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.” 28 C.F.R § 35.104.

537. The TAS Defendants are public entities subject to Title II of the ADA, 42 U.S.C. § 12131.

538. Jane Doe is a qualified person with a disability within the meaning of 42 U.S.C. § 12131. *See also* 42 U.S.C. § 12102.

539. Defendants intentionally violated Jane's rights under the ADA and its regulations by excluding her from participation in and denying her the benefits of

Defendants' services, programs, and activities, on the basis of disability, and by subjecting her to discrimination in violation of 42 U.S.C. § 12132.

540. Defendants intentionally violated Jane Doe's rights by failing to provide the reasonable modifications and auxiliary aids and services necessary to ensure that Jane Doe's access to her education was equal to and as effective as others.

541. Through the acts and omissions described herein, Defendants discriminated against Jane Doe in violation of the ADA, including, but not limited to the following ways:

a. Denying Jane Doe the opportunity to participate in or benefit from educational services equal to that afforded to other students;

b. Denying Jane Doe educational services that were as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

c. Denying Jane Doe the opportunity to receive educational programs and services in the most integrated setting appropriate to her needs;

d. Failing to make reasonable modifications to its programs and services necessary to avoid discrimination against Jane Doe; and

e. Utilizing methods of administration that had the effect of defeating or substantially impairing the accomplishment of the objectives of

Defendants' educational programs with respect to Jane Doe.

542. Defendants otherwise intentionally discriminated against Jane in violation of 42 U.S.C. § 12132.

543. Defendants' violations of the ADA have caused, and continue to cause, actual and proximate harm to Jane Doe.

544. At the time Defendants violated Jane Doe's rights under the ADA as set forth above, Defendants, and their respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

545. Defendants, and their respective agents, acted with reckless or callous indifference to Jane Doe's federally protected rights under the ADA.

546. Defendants, and their respective agents, exhibited bad faith and/or gross misjudgment in engaging in the conduct that violated Jane Doe's rights under Title II of the ADA.

547. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT XI**
**Retaliation**
**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq.***
**(The TAS Defendants)**

548. Plaintiffs incorporate by reference all previous paragraphs of the Complaint herein.

549. Title II of the ADA prohibits retaliation, stating:

> (a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.
>
> (b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.

28 C.F.R. § 35.134.

550. Following Plaintiffs filing of a due process complaint against TAS and the execution of a settlement agreement, TAS retaliated against Jane Doe by denying her continued access to services by a qualified and known special education teacher and denying her access to continued in-person special education services.

551. Defendants are liable for the retaliation against Jane Doe because Defendants had actual knowledge that Plaintiffs had engaged in protected activity

and took deliberately harmful actions against Jane Doe in response.

552. Defendants' violations of the ADA have caused, and continue to cause, actual and proximate harm to Jane Doe.

553. At the time Defendants violated Jane Doe's rights under the ADA as set forth above, Defendants, and their respective agents, had knowledge that a harm to a federally protected right was substantially likely, and was deliberately indifferent to that risk.

554. Defendants, and their respective agents, acted with reckless or callous indifference to Jane Doe's federally protected rights under the ADA.

555. Defendants, and their respective agents, exhibited bad faith and/or gross misjudgment in engaging in the conduct that violated Jane Doe's rights under Title II of the ADA.

556. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT XII**
***Monell* Liability**
**42 U.S.C. § 1983 and the First Amendment**
**to the U.S. Constitution**
**(The TAS Defendants)**

557. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

558. At all times relevant, the TAS Defendants had a policy or practice of failing to properly train, discipline and supervise its staff, promulgating and maintaining *de facto* unconstitutional customs, policies, or practices rendering them liable for the constitutional violations alleged herein under *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978).

559. At all times relevant, the TAS Defendants knew or should have known that the policies, procedures, training supervision and discipline of its staff was inadequate for the tasks that they were required to perform.

560. At all times relevant, the TAS Defendants failed to establish, implement or execute adequate policies, procedures, rules and regulations to ensure its staff complied with state and federal laws and did not engage in unconstitutional acts, such as discrimination and retaliation, against individuals such as Jane Doe.

561. The TAS Defendants authorized, approved, or knowingly acquiesced in the retaliation against individuals, and knew or should have known that such treatment would deprive individuals, such as Jane Doe, of their legal and

constitutional rights.

562. By inadequately training and/or supervising its staff and having a custom or policy of deliberate indifference to the constitutional rights of individuals such as Plaintiff, the TAS Defendants encouraged and cultivated the conduct which violated Jane Doe's rights under the First and Fourteenth Amendments to the United States Constitution and the relevant state and federal laws discussed herein.

563. The TAS Defendants' deliberate actions to maintain a policy or practice of failing to train and supervise its staff was the moving force behind the legal violations outlined in this Complaint.

564. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT XIII**
**Disability Discrimination**
**Violation of the Persons with Disabilities**
**Civil Rights Act, M.C.L. 37.1101, *et seq.***
**(All Defendants)**

565. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

566. PDCRA guarantees, as a civil right, the full and equal utilization of public accommodations, public services, and educational facilities without discrimination because of a disability. M.C.L. 37.1102(1).

567. PDCRA further prohibits educational institutions from "[d]iscriminat[ing] in any manner in the full utilization of or benefit from the institution, or the services provided and rendered by the institution to an individual because of a disability that is unrelated to the individual's ability to utilize and benefit from the institution or its services, or because of the use by an individual of adaptive devices or aids." M.C.L 37.1402(a).

568. Defendants TAS and TAS Board are educational institutions within the meaning of M.C.L. 37.1401.

569. Jane Doe has a disability as defined in M.C.L. 37.1103(d)(i)(C).

570. Jane's disabilities are unrelated to her ability to utilize and benefit from Defendants' services.

571. Defendants discriminated against Jane in the full utilization of or benefit from the services provided and rendered by Defendants due to Jane's disabilities including, but not limited to the following ways:

a. Denying Jane Doe the opportunity to participate in or benefit from educational services equal to that afforded to other students;

b. Denying Jane Doe educational services that were as effective in

affording equal opportunity to obtain the same result, gaining the same benefit, or reaching the same level of achievement as that provided to other students;

c. Denying Jane Doe the opportunity to receive educational programs and services in the most integrated setting appropriate to her needs;

d. Failing to make reasonable modifications to its programs and services necessary to avoid discrimination against Jane Doe;

e. Utilizing methods of administration that had the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to Jane Doe;

f. Denying Jane Doe the opportunity to participate in the benefits of public education equal to that afforded to other similarly situated students, including having access to educational instruction in an amount equal to that of her same-age, non-disabled peers;

g. Failing to provide Jane Doe an opportunity to participate in or benefit from the public education equal to that afforded to other similarly situated students;

h. To the extent Defendants provided any public educational services to Jane Doe during the time pertinent to this Complaint, such services were not appropriate or reasonably calculated to provide

Jane Doe an opportunity to participate in or benefit from the public education equal to that afforded other public-school students; and

i. Failing to educate Jane Doe, or provide for Jane Doe's education, with nondisabled students to the maximum extent appropriate to Jane Doe's needs.

572. Defendants otherwise violated Jane's rights under PDCRA.

573. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT XIV**
**Retaliation**
**Violation of the Persons with Disabilities**
**Civil Rights Act, M.C.L. 37.1101, *et seq.***
**(All Defendants)**

574. Plaintiffs incorporate by reference all previous paragraphs of the Complaint herein.

575. PDCRA prohibits retaliation, stating, "A person or 2 or more persons shall not do the following: (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge,

filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." M.C.L. 37.1602(a).

576. Following Plaintiffs' filing of a due process complaint against TAS and the execution of a settlement agreement, Defendants retaliated against Jane Doe by denying her continued access to services by a qualified and known special education teacher and denying her access to continued in-person special education services.

577. Defendants are liable for the retaliation against Jane Doe because Defendants had actual knowledge that Plaintiffs had engaged in protected activity and took deliberately harmful actions against Jane Doe in response.

578. Defendants' violations of PDCRA have caused, and continue to cause, actual and proximate harm to Jane Doe.

579. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

## COUNT XV
**Gross Negligence**
**M.C.L. 691.1407, *et seq*.**
**(All Defendants)**

580. Plaintiffs reallege and incorporate by reference the allegations

contained in the previous paragraphs.

581. Defendants had a special relationship with Jane Doe, obligating Defendants, individually and collectively, to provide safe care and treatment.

582. Defendants owed Jane Doe a duty to conform to a specific standard of conduct to protect her from unreasonable risk of injury.

583. Defendants breached their duty to Jane Doe by failing to properly respond to Jane Doe's reports of sex discrimination, failing to provide her with information about supportive measures, failing to ensure that the limited supportive measures they provided were actually implemented, failing to timely provide her with information on how to make a formal complaint of sex discrimination, and failing to adequately train and supervise their staff with respect to the handling of complaints of sex discrimination.

584. Defendants' conduct evidences a high degree of carelessness and shows a reckless disregard of the consequences.

585. Defendants engaged in willful and wanton misconduct.

586. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the

ordinary pleasures of everyday life.

**<u>COUNT XVI</u>**
**Violation of Michigan's "Rethink Discipline" Law**
**M.C.L. 380.1310d, *et seq*.**
**(The TAS Defendants)**

587. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

588. M.C.L. 380.1310d(1) requires the following factors to be considered prior to suspending or expelling a student:

a. The pupil's age;

b. The pupil's disciplinary history;

c. Whether the pupil is a student with a disability;

d. The seriousness of the violation or behavior committed by the pupil;

e. Whether the violation or behavior committed by the pupil threatened the safety of any pupil or staff member;

f. Whether restorative practices will be used to address the violation or behavior committed by the pupil;

g. Whether a lesser intervention would properly address the violation or behavior committed by the pupil.

589. M.C.L. 380.1310d(2) creates a rebuttable presumption that a suspension of more than ten days or an expulsion is not justified unless the school board or its designee can demonstrate that it considered each of the factors listed

above.

590. M.C.L. 380.1310d defines a suspension as an exclusion from school for disciplinary reasons for a period of fewer than 60 school days.

591. TAS makes available a public education to students who meet eligibility criteria under TAS policy and state law, respectively.

592. At all times relevant to this Complaint, Jane Doe met criteria to receive public K-12 education under Michigan law and TAS policy but was unlawfully denied that education on the basis of her disabilities.

593. TAS, through its agents acting under color of law, unlawfully expelled Jane Doe on October 30, 2023, without any demonstration that it meaningfully considered the seven factors set forth in M.C.L. 380.1310d(1) in violation of her right to access a public education.

594. At the time TAS violated Michigan Law as set forth above, TAS and its respective agents had knowledge that a harm to a state- and federally-protected right was substantially likely and were deliberately indifferent to that risk.

595. TAS's violations of Michigan Law has caused and continues to cause actual and proximate harm to Jane Doe.

596. TAS and its respective agents acted with reckless or callous indifferent to Jane Doe's rights under Michigan law.

597. As a direct and proximate result of Defendants' wrongful acts and

omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT XVII**
**Breach of Contract**
**(The TAS Defendants and**
**Defendant Klinger)**

598. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

599. Under Michigan law, the elements necessary to establish a breach-of-contract claim are: (1) the existence of a contract between the parties; (2) the terms of the contract require performance of a certain action; (3) a party breached the contract; and (4) the breach caused the other party injury. *Webster v. Edward D. Jones & Co*., 197 F.3d 815, 819 (6th Cir. 1999).

600. Jane Doe and TAS entered into a contractual agreement when Jane Doe enrolled in TAS for the 2023-2024 school year.

601. Upon enrolling in TAS, students are provided with a student handbook containing policies to be followed by both students and employees, constituting an implied contract.

602. Plaintiffs were provided a copy of the TAS Student Handbook in 2023

when Jane Doe enrolled.

603. The Student Handbook required TAS to investigate any allegations within the scope of Title IX and to provide interim measures to support the student.

604. Defendants breached their contract with Jane Doe by violating their own Title IX policies and the Student Handbook.

605. This breach of contract was unjustified, particularly since Jane Doe was a minor child.

606. As a direct and proximate result of Defendants' wrongful acts and omissions, Jane Doe has sustained injuries and damages, including, but not limited to economic loss; loss of earnings capacity; educational loss; pain and suffering; mental and emotional distress, including anxiety, mental anguish, humiliation, embarrassment; loss of relationships; damage to her good name; and loss of the ordinary pleasures of everyday life.

**COUNT XVIII**
**Injunctive Relief**

607. Plaintiffs incorporate by reference the allegations contained in the previous paragraphs.

608. Plaintiffs are entitled to injunctive relief under Title IX, 20 U.S.C. § 1681 *et seq*., and its implementing regulations 34 C.F.R. Part 106.

609. Plaintiffs seek to compel Defendants to create and/or revise the TAS Title IX policy and procedure to require immediate notice to the parents or guardians

of all students involved in or the victims of any substantiated or confirmed sexual misconduct.

610. Plaintiffs seek to compel Defendants to disseminate to all TAS administrators, faculty, staff, students, parents, and guardians the revised TAS Title IX policy and complaint procedure and to post the policy and procedure in a conspicuous location on its website.

611. Plaintiffs seek to compel Defendants to train all TAS staff, including but not limited to administrators, Title IX Coordinators, and teachers, on proper and industry standard Title IX reporting, response, and investigation procedures. Plaintiffs seek to provide input on the selection of the training provider and specifically requests that the training provider not be Thrun Law Firm.

612. Plaintiffs seek to compel Defendants to remove any sentences or instructions from its Title IX-related communications that chill the speech of TAS students or parents.

613. Plaintiffs seek to compel Defendants to expunge Jane Doe's disciplinary record and to remove any sentences or references to the alleged incident and Jane Doe's subsequent expulsion from her education and special education records.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiffs demand judgment against Defendants

as follows: injunctive relief; compensatory damages in whatever amount Jane Doe is found to be entitled; exemplary damages in whatever amount Jane Doe is found to be entitled; punitive damages in whatever amount Jane Doe is found to be entitled; attorney fees and costs incurred in pursuing this matter; and any other legal or equitable relief as appropriate at the time of final judgment.

## DEMAND FOR JURY TRIAL

NOW COME Plaintiffs S.R. and T.R., parents and legal guardians of JANE DOE, by and through her undersigned counsel, and hereby demand a trial by jury of all the issues in this case.

Dated: August 28, 2026

Respectfully Submitted,

***s/ Jacquelyn Kmetz (P83575)***
Jacquelyn Kmetz (P83575)
Elizabeth Abdnour (P78203)
Ashley Dylenski (P88208)
ABDNOUR WEIKER, LLP
325 E. Grand River Ave., Suite 250
East Lansing, MI 48823
(517) 994-1776
jacquelyn@education-rights.com
liz@education-rights.com
ashley@education-rights.com

*Attorneys for Plaintiffs*